

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | *Opinion issued April 30, 2024* |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | No. SC100303 |
| | ) | |
| TIFFANY J. MILLS, | ) | |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### The Honorable Kenneth R. Garrett III, Judge

Tiffany Mills appeals her conviction for third-degree assault and armed criminal action. She argues the circuit court erred in (1) failing to hold a jury-tried punishment stage, (2) excluding certain evidence during trial, and (3) failing to appoint counsel at her initial appearance before the court. Finding no error, this Court affirms the circuit court's judgment.[1]

### Factual and Procedural Background

Mills' boyfriend ("Boyfriend") became friends with a woman ("Victim") at their mutual workplace. One evening in April 2020, Boyfriend texted Victim asking for a ride

---

[1] Portions of this opinion are taken from the court of appeals' opinion by Judge Alok Ahuja.

to pick up some food. Boyfriend also texted Mills the same request. Upon Boyfriend's request, Victim and Mills each drove to and parked in front of Boyfriend's house. Victim's son was in the backseat of her vehicle.

When Victim arrived at Boyfriend's house, Mills was already parked outside. Victim testified Mills got out of her car, approached Victim, asked who Victim was and what she was doing there, and accused Victim of sleeping with Boyfriend. Boyfriend came out of the house briefly, then went back inside with Mills.

Mills again exited the house and walked toward Victim's car with something silver in her hand. Victim told Mills not to key her car. Mills walked toward the driver's side of the car, and Victim stepped out of the driver's seat. Mills pushed Victim, and then Victim tried to hit Mills. Victim hit Mills once and tried to grab Mills' hair with her other hand. Mills grabbed Victim's wrist, and Victim eventually realized Mills was stabbing her. Mills stabbed Victim seven times.

Boyfriend exited the house again, at which point Mills stopped and engaged with him. Victim went back to her car. Mills tried to hit Boyfriend a couple of times but did not make contact.

Boyfriend testified Mills called him when she arrived. While on the phone, Mills asked Boyfriend who Victim was, and Boyfriend told Mills to go back to her car because he would be right out. Boyfriend heard scuffling and immediately ran outside while still on the phone with Mills. Boyfriend saw Mills on her knees in front of Victim. Victim was holding Mills with one hand and hitting her with the other. Mills was fighting back.

2

Mills testified Victim attacked her first. Mills did not know Victim but saw her arrive at Boyfriend's house just after Mills arrived. Mills was on the phone with Boyfriend and mentioned the other car to him as she walked toward his house. After Boyfriend told Mills to go back to her car because he would be out soon, Mills walked in front of Victim's car on the way back to her own and realized Victim was female. Mills went back to Boyfriend's house and asked him why another woman was there for him. Boyfriend again told Mills to go back to her car and he would be there soon.

Mills testified she went back outside, stopped in front of Victim's car, and told Victim, "you can leave, b[****], he's not going anywhere with you." Mills testified Victim put her car in drive and came toward her, causing Mills to jump into the grass. Victim got out of the car, came around to the passenger side, and "started coming at" Mills. Mills called the police. Victim grabbed Mills by the hair and hit her in the face approximately 10 to 15 times. Mills was knocked to her knees and could not see because of a bleeding cut near her eye.

Mills testified she had a knife clipped to her purse, which she grabbed during the fight. As she tried to open the knife, she cut through the tendons of two of her fingers and could hold the knife only with her remaining three fingers. Mills stabbed at Victim, though she did not know whether the knife made contact because it did not appear to slow Victim, as she continued to punch Mills in the face. Mills testified Boyfriend eventually came out of the house and pulled Victim off of Mills. Victim went to her car, and Mills began yelling at Boyfriend as the police arrived.

The police officers went to Boyfriend's house in response to a report of a male and female fighting in the street or for a "domestic disturbance/robbery." When they arrived, they saw Boyfriend and Mills arguing and yelling in close proximity to each other. Mills tried to hit Boyfriend, so the officers separated them and took their statements. Mills told police she went to Boyfriend's house, where another female arrived and started a fight with her. Police did not observe any injury to Mills except the cut on her hand, which she said was self-inflicted. Mills told police she pulled her knife out because she felt threatened but ultimately cut herself with it. Neither Boyfriend nor Mills indicated anyone needed medical attention. Mills left the scene.

Victim stayed in her car while police were at the scene. She texted Boyfriend that she had been stabbed but did not want to tell the police. After the police left, Boyfriend drove Victim to the hospital. She needed emergency surgery for the stab wounds to her stomach, arm, and back. The surgeon testified at trial as to Victim's injuries, which included a lacerated spleen, a partially collapsed lung, and significant blood loss.

The state filed a complaint charging Mills with first-degree assault and armed criminal action. A warrant issued for her arrest on May 9, 2020, and bond was set. At Mills' initial appearance on May 11, the circuit court referred the case to the public defender's office for screening and scheduled a bond reduction hearing for May 18. The docket entry for the May 11 appearance reflects that bond remained the same as previously set. On May 14, a public defender entered an appearance on Mills' behalf and filed a motion for bond reduction. On May 18, the circuit court sustained Mills' motion for bond reduction and released her on her own recognizance under house arrest.

4

Mills planned to assert self-defense at trial and call Victim's sister-in-law ("Sister-in-Law") to testify about Victim's reputation for violence. Prior to trial, the state filed a motion to exclude Sister-in-Law's testimony, arguing the testimony improperly consisted of specific acts of violence and Sister-in-Law was not competent to testify as to Victim's reputation due to her lack of association with Victim for many years. In response, Mills argued she planned to ask Sister-in-Law only about Victim's general reputation and not any specific acts. The circuit court overruled the state's motion to exclude but held the state could *voir dire* Sister-in-Law before her testimony at trial and renew the motion thereafter.

Trial commenced in April 2022. During her opening statement, Mills told the jury Victim "has a reputation for being aggressive." The state objected to this comment. The circuit court told Mills to "stay away" from that issue until it had an opportunity to decide whether such evidence would be admissible but did not sustain the objection, strike the statement, or otherwise instruct the jury to disregard it.

The state called Boyfriend as a witness. During direct examination, the prosecutor asked Boyfriend if he knew Victim to be an aggressive person. Boyfriend answered, "Not really, no."

Later in trial, Mills indicated she would be calling Sister-in-Law to testify as to four specific bad acts either Sister-in-Law or Sister-in-Law's husband witnessed Victim commit. The state argued the specific acts were not admissible and only reputation evidence could be admitted to prove who the initial aggressor was. In response, Mills

5

argued the state opened the door to evidence of specific bad acts by eliciting Boyfriend's testimony that Victim did not have a reputation for violence.

The circuit court then proceeded with Sister-in-Law's *voir dire*. The state asked Sister-in-Law about her knowledge of Victim's reputation, and Sister-in-Law stated Victim had a reputation of being "a very violent person." The state then asked if Sister-in-Law had been personally involved with any violent altercations with Victim. Sister-in-Law described several instances, some of which involved her personally and some did not. First, Sister-in-Law described an incident during which she started a fight with Victim and beat her up. Sister-in-Law stated she started the fight because Victim and her friends allegedly beat up her husband, Sister-in-Law's brother. Sister-in-Law recalled a second incident in which Victim "was in [Sister-in-Law's] grandma's face and yelling at her." Third, Sister-in-Law testified about a time she was with Victim in a Walmart four years earlier, when Victim thought a person at a nearby register was looking at her. Victim verbally confronted the person, though she did not get violent during the incident.

Sister-in-Law testified about three other instances she heard about from other people in which Victim acted violently or aggressively. She stated Victim assaulted her husband multiple times, causing the police to be called. One of these incidents occurred outside Victim's work, another occurred in a hotel, and the last involved Victim and Victim's friends assaulting Victim's husband (this was the incident noted above in which Sister-in-Law started a fight with Victim).

6

The circuit court permitted Sister-in-Law to testify about the Walmart incident and the fight between Sister-in-Law and Victim. As to the other instances, the court found the probative value would be substantially outweighed by the prejudicial effect of that testimony.

The issue of self-defense was submitted to the jury. The jury found Mills guilty of the lesser-included offense of third-degree assault and armed criminal action. After the jury returned its verdict, Mills waived her right to jury sentencing pursuant to a sentencing agreement she reached with the state. The following exchange occurred between Mills and the circuit court:

> THE COURT: Ma'am, you have just been found guilty by a jury of your peers of the charges of assault in the third degree and armed criminal action. You have a right to be sentenced by the jury that has just found you guilty to these offenses. And it's my intention from reading instructions that it was your intention to have the jury sentence you at this time. Do you still wish the jury to sentence you for these charges?
>
> MILLS: No.
>
> THE COURT: And you wish to waive that?
>
> MILLS: Yes.
>
> THE COURT: And you discussed this fully with your attorney?
>
> MILLS: Yes.
>
> THE COURT: And this is a knowing, voluntary waiver of your right to be sentenced by this jury?
>
> MILLS: Yes, sir.
>
> THE COURT: And you understand you can't change your mind thereafter as soon as I accept this waiver?

MILLS:  Yes, sir.

THE COURT:  And you fully discussed this decision with your lawyer?

MILLS:  Uh-huh.

THE COURT:  Is that a yes?

MILLS:  Yes, sir.

THE COURT:  And you understand during this proceeding of your sentencing that you would have the opportunity to present any evidence that you wish in front of the jury and the jury would hear that evidence and then deliberate and arrive at a punishment based upon all the evidence in this case?

MILLS:  Uh-huh.

THE COURT:  Again, you wish to waive that?

MILLS:  Yeah.

At a subsequent sentencing hearing, the circuit court sentenced Mills to the sentence agreed to by both parties in the sentencing agreement – three years imprisonment on each offense, to run concurrently.  Mills appeals.

**Standard of Review**

Mills concedes she failed to preserve Points I (judge in lieu of jury sentencing) and III (lack of counsel at initial hearing) below.  Accordingly, she requests plain error review of these points.  Whether an unpreserved claim is statutory, constitutional, structural, or of some other origin, "Rule 30.20 is the exclusive means by which an appellant can seek review of any unpreserved claim of error and said claim … is evaluated by this Court's plain error framework without exception." *State v. Minor*, 648 S.W.3d 721, 731 (Mo. banc

8

2022) (quotations omitted). Moreover, "[p]lain error review is discretionary." *Id.* (quotations omitted).

> In conducting plain error review, the Court conducts a two-step process:
>
> The first step requires a determination of whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear. If plain error is found, the court then must proceed to the second step and determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.

*Id.* (quotations omitted). Moreover, "[t]o obtain a new trial on direct appeal based on a claim of plain error, the appellant must show the error was outcome determinative." *Id.* (quotations omitted).

In Point II, Mills argues the circuit court erred in excluding evidence of previous instances of Victim's violent behavior. "The circuit court has broad discretion in admitting evidence at trial, and error will be found only for a clear abuse of this discretion." *State v. Brandolese*, 601 S.W.3d 519, 533 (Mo. banc 2020).

> This Court will find a circuit court abused its discretion only when a ruling is clearly against the logic and circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*Id.* (quotations omitted). Moreover, "[t]his Court reviews the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.* at 533-34 (quotations omitted). Trial court error is prejudicial

9

if "there is a reasonable probability that the trial court's error affected the outcome of the trial." *Id.* at 534 (quotations omitted).

### Point I – Mills Waived Her Right to Jury Sentencing and Has Not Established the Circuit Court's Decision to Assess Punishment Resulted in Manifest Injustice

In Point I, Mills argues the circuit court plainly erred in failing to hold a jury-tried punishment stage because she did not make a written request prior to *voir dire* that the court, rather than the jury, assess her punishment, as subdivision (1) of section 557.036.4 requires.

Section 557.036.4 provides:

A second stage of the trial shall not proceed and the court, and not the jury, shall assess punishment if:

(1) The defendant requests in writing, prior to voir dire, that the court assess the punishment in case of a finding of guilt; or

(2) The state pleads and proves the defendant is a prior offender, persistent offender, dangerous offender, or persistent misdemeanor offender as defined in section 558.016, or a persistent sexual offender or predatory sexual offender as defined in section 566.125. If the jury cannot agree on the punishment to be assessed, the court shall proceed as provided in subsection 1 of this section. If, after due deliberation by the jury, the court finds the jury cannot agree on punishment, then the court may instruct the jury that if it cannot agree on punishment that the court will assess punishment.

While there is no constitutional right to jury sentencing, a defendant does have such a right by operation of statute, as codified in section 557.036. *State v. Emery*, 95 S.W.3d 98, 102 (Mo. banc 2003). This Court has been clear, however, that even if the procedures outlined in section 557.036 to obtain court-assessed punishment are not properly followed, a defendant, nonetheless, can waive the statutory right to jury sentencing when "he allow[s]

10

the judge to determine his sentence without raising his right to have the jury recommend a sentence." *Id.*

While *Emery* was concerned with subdivision (2) of section 557.036.4, it is, nonetheless, persuasive here. In *Emery*, the defendant argued the circuit court erroneously sentenced him because the state failed to plead and prove he was a prior or persistent offender under subdivision (2), a condition necessary to permit the court, rather than the jury, to assess punishment. *Id.* This Court rejected the defendant's argument because he failed to raise the issue whatsoever and, instead, "chose to sit on his statutory right." *Id.* at 103. This Court held the defendant "waived his statutory right to a jury-recommended sentence" because he "allowed the judge to determine his sentence without raising his right to have the jury recommend a sentence." *Id.* at 102.

Following *Emery*, the court of appeals rejected an argument involving subdivision (1) nearly identical to the one Mills presents here. In *State v. Weaver*, the trial judge, not the jury, assessed punishment after the defendant orally requested as such after the prosecutor's opening statement. 178 S.W.3d 545, 546 (Mo. App. 2005). The court of appeals noted, "[l]ike in *Emery*, the trial court … did not follow the explicit guidelines of [section 557.036.4]" because "[t]he defendant's request for the judge to determine his punishment was neither in writing nor prior to voir dire." *Id.* at 548.

The court explained "[t]his, however, does not end the matter." *Id.*

In spite of the trial court's error, Weaver validly waived his right to jury sentencing when he requested the judge through his attorney to determine his punishment. In *Emery,* all that was required for the defendant to waive his right to jury sentencing was for him "to sit on his statutory right" and allow the judge to determine his sentence. 95 S.W.3d at 103. Here, not only did

11

Weaver choose not to invoke his right to jury sentencing, but he also affirmatively expressed to the court, on three separate occasions, his request for the judge to sentence him. There is absolutely no evidence that Weaver did not intelligently waive his right. Although the better practice, under these circumstances, would have been to conduct a hearing on the record with the defendant affirmatively waiving his statutory right, and such hearing being held prior to submission of the case, the failure to do so does not entitle Weaver to a reversal and remand.

*Id.*

Here, like in *Weaver*, the circuit court permitted Mills to waive jury sentencing ***at her own request***. The court even made a clear record that her waiver was knowing and voluntary and twice asked Mills whether she wished to waive her right to jury sentencing and whether she had discussed the decision with her attorney, going beyond what was held sufficient for waiver in both *Emery* and *Weaver*. The record reflects that Mills requested the judge assess her punishment so she could take advantage of a sentencing agreement she reached with the state of three years on each count to run concurrently. This agreement was advantageous for Mills because a three-year sentence for armed criminal action is the minimum sentence allowed under section 571.015.1.

Like in *Weaver*,

[Mills] fails to show under the plain error standard of review that manifest injustice has occurred. [Mills] urges this [C]ourt to reverse the trial court's determination of h[er] sentence because the trial judge erroneously granted *h[er] request* to be sentenced by the court. Under the plain error standard, this [C]ourt cannot find that manifest injustice has taken place when [Mills] requested court sentencing and is merely unhappy with the result.

*Id.*

12

Indeed, "[i]t is axiomatic that a defendant may not take advantage of self-invited error or error of his own making." *State v. Bolden*, 371 S.W.3d 802, 806 (Mo. banc 2012) (quotations omitted). As such, "this Court will not use plain error to impose a *sua sponte* duty on the trial court to correct [a d]efendant's invited errors." *Id.* Point I is denied.

**Point II – the Circuit Court Did Not Abuse Its Discretion in Excluding Evidence of Specific Instances of Victim's Violent Behavior**

Mills argues the circuit court erred in excluding evidence of specific instances of Victim's violent behavior beyond the two instances it did admit. Mills argues that, once the state elicited Boyfriend's testimony that Victim did not have a reputation for violence, it opened the door for rebuttal testimony in the form of specific instances of Victim's violent behavior. This argument fails because the circuit court did not exclude Mills' proffered evidence on the basis it constituted impermissible character evidence, but on the basis it was legally irrelevant. Among other criteria, evidence must be legally relevant to be admissible. *C.f. Porter v. Toys 'R' Us-Del., Inc.*, 152 S.W.3d 310, 318 (Mo. App. 2004) ("Logically relevant evidence is not necessarily admissible; the evidence must also be legally relevant."); *Davis v. State*, 653 S.W.3d 169, 174 (Mo. App. 2022). "Evidence is legally relevant if its probative value outweighs the dangers of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." Davis, 653 W.W.3d at 174 (quotation omitted). Here, the circuit court determined Mills' proffered evidence was inadmissible because its probative value was substantially outweighed by its prejudicial effect, *i.e.*, it was not legally relevant as required for admissibility. Even if Mills' argument is correct and her proffered evidence of specific instances of Victim's

violent behavior was admissible character evidence, she fails to show how the evidence was not properly excluded because it was legally irrelevant. *Porter*, 152 S.W.3d at 318; *Davis*, 653 S.W.3d at 174.

Indeed, the circuit court did not abuse its discretion in excluding Mills' proffered evidence. "The circuit court enjoys considerable discretion in the admission or exclusion of evidence," and this Court reviews to determine "not … whether the evidence was admissible but … whether the trial court abused its discretion in excluding the evidence." *Rhoden v. Mo. Delta Med. Ctr.*, 621 S.W.3d 469, 484 (Mo. banc 2021) (quotations omitted). A circuit court's evidentiary decision is reversed "only when there is a clear abuse of discretion[,]" which "occurs only if the circuit court's ruling admitting or excluding evidence is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *State v. Moore*, 682 S.W.3d 436, 445 (Mo. App. 2024) (quotations omitted).

Mills sought to introduce testimony of Victim's Sister-in-Law as to six separate incidents in which Victim acted violent or aggressive. The circuit court conducted extensive *voir dire* of Sister-in-Law regarding the alleged instances of Victim's violent behavior. The circuit court also heard extensive argument from the state and Mills as to whether this evidence was relevant and otherwise admissible to show Victim acted in accordance with her character as the initial aggressor in the fight with Mills. The state objected to three of the alleged incidents on the grounds Sister-in-Law did not have firsthand knowledge of the incidents, and to a fourth incident involving Victim arguing

14

with her grandmother in high school as irrelevant to whether she was the initial aggressor in the fight with Mills. The State also objected to an incident involving Victim confronting a person in Walmart as irrelevant, but Mills responded by arguing it demonstrated Victim's tendency to initiate confrontation. Finally, Mills sought to introduce Sister-in-Law's first-hand account of a fight she had with Victim.

Upon hearing the nature of the evidence and arguments pertaining to its relevance and potential admissibility as character evidence, the circuit court permitted Mills to introduce evidence of two specific instances of Victim's violent or aggressive behavior while excluding evidence of the alleged instances Sister-in-Law had not witnessed first-hand and the high school incident involving Sister-in-Law's grandmother. Assuming for the sake of argument that any of Victim's alleged instances of violent behavior were admissible as character evidence, the circuit court acted within its discretion in limiting the extent of Sister-in-Law's testimony so as to avoid "unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Davis*, 653 S.W.3d at 174. The record in this case and the fact the circuit court permitted Mills to introduce evidence of two specific instances indicate the circuit court carefully and deliberately considered the issue. Point II is denied.

### Point III – the Circuit Court Did Not Plainly Err in Failing to Appoint Counsel at Mills' May 11 Appearance

In her final point, Mills argues the circuit court plainly erred in failing to appoint counsel at her May 11 appearance, which Mills argues was both her initial appearance and a bail review hearing. Embedded in Mills' Point III are three distinct arguments this Court

15

addresses below: (1) whether Rule 31.02(a) requires the appointment of counsel at the initial appearance, and whether (2) an initial appearance or (3) a bail review hearing is a critical stage of the prosecution such that the presence of counsel is constitutionally required.

*State v. Woolery*, No. SC100170, __ S.W.3d __ (Mo. banc Apr. 30, 2024), handed down this same day, addressed the first two questions posed by Mills' Point III. This Court held that Rule 31.02(a) does not guarantee the presence of counsel at an initial appearance because the rule expressly contemplates a defendant "may be without counsel upon [her] first appearance" and obligates the circuit court to appoint counsel only upon a showing of indigency. *Id.* at 11-13. Here, like in *Woolery*, no indigency showing or determination was made prior to or during Mills' May 11 appearance. The circuit court, therefore, had no duty to appoint counsel under Rule 31.02(a). This Court further held in *Woolery* that an initial appearance is not a critical stage of a criminal prosecution triggering the constitutional right to counsel because, in Missouri, that proceeding does not involve "a trial-like confrontation" during which a lack of counsel "would impair defense on the merits." *Id.* at 14-15. *Woolery*, however, did not address whether a pretrial release proceeding, which is sometimes referred to as a bail review or bond hearing, is a critical stage of a criminal prosecution.[2]

---

[2] It is unclear from the record whether the circuit court conducted a bail review hearing or considered Mills' conditions of release in accordance with Rule 33.01 at the May 11 initial appearance. The docket merely indicates bond remained as previously set in the warrant for Mills' arrest. Because the circuit court's order entered following the May 11 initial appearance indicates conditions of release were set, however, presumably the circuit court

This Court holds a proceeding during which the circuit court considers or determines conditions for pretrial release – whether it is during an initial appearance, arraignment, or a separate bail review hearing under Rule 33.05 – is not a critical stage requiring the presence of counsel. As this Court stated in *Woolery*, critical stages are defined as "proceedings between an individual and agents of the state, whether formal or informal, that amount to trial-like confrontations at which counsel would help the accused in coping with legal problems or meeting his adversary." *Id.* at 13-14 (quotations and alterations omitted). "Critical stages are those pretrial procedures that would impair defense on the merits if the accused is required to proceed without counsel." *Id.* at 14. The consideration of pretrial release conditions is not such a stage.

The United States Supreme Court's decision in *Gerstein v. Pugh*, 420 U.S. 103 (1975), supports this holding. In *Gerstein*, the Supreme Court held the Fourth Amendment probable cause determination required after a warrantless arrest is not a critical stage requiring the presence of counsel. *Id.* at 122-23. The Supreme Court explained the Fourth Amendment probable cause determination at issue has "limited function" and is of a "nonadversary character" because it "is addressed *only* to pretrial custody." *Id.* The Supreme Court further explained that, unlike more formal proceedings, this proceeding does not require the accused to confront or cross-examine the state's witnesses, nor would it have any bearing on whether the accused would be charged. *Id.* at 123.

---

considered conditions of release at this hearing. This Court therefore addresses Mills' argument.

17

*Gerstein*'s holding persuades this Court that a proceeding considering or determining conditions of pretrial release, likewise, is not a critical stage. In Missouri, a pretrial release proceeding does not require the presentation, confrontation, or cross-examination of witnesses. Rather, these proceedings "shall be informal and rules of evidence need not apply." Rule 33.07(a). Further, any given pretrial release proceeding does not permanently fix a defendant's bail for the remainder of the proceedings, as "there is no one single bail hearing, and in any given criminal prosecution, there may be multiple bail hearings reviewing the conditions of release." *Woolery*, No. SC100170, __ S.W.3d at __, *slip op.* at 9.

This Court acknowledges the significant impact pretrial detention may have on a defendant. *See Gerstein*, 420 U.S. at 114, 123 ("Pretrial confinement may imperil the suspect's job, interrupt his source of income, … impair his family relationships[,]" and "affect to some extent the defendant's ability to assist in preparation of his defense."). These consequences, however, do not render a pretrial release proceeding a critical stage during which a defense on the merits is impaired if the accused is required to proceed without counsel. Like the Fourth Amendment probable cause determination in *Gerstein*, a pretrial release proceeding in Missouri is not a critical stage.

Because Mills' May 11 appearance did not include a critical proceeding, the only way for Mills' claim to succeed is if she suffered some recognizable prejudice from counsel's absence. *Woolery*, No. SC100170, __ S.W.3d at __, *slip op.* at 18. Mills argues she would have been able to secure pretrial release at the May 11 appearance had counsel been present, rather than seven days later when she was eventually released on her own

18

recognizance under house arrest after counsel entered and filed a motion for bond reduction on May 14. Mills fails to explain, however, how seven additional days of pretrial detention prejudiced her ***during trial***, much less how this purported error was "outcome determinative" under the plain error standard of review. *Minor*, 648 S.W.3d at 731. Point III is denied.

## Conclusion

Finding no error, the circuit court's judgment is affirmed.

                                                  _____

                                                  Robin Ransom, Judge

All concur.